IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>vs.<br><br>DARNELL POLITE,<br><br>     Defendant. | 8:17CR45<br><br>**FINDINGS AND RECOMMENDATION** |

   This matter is before the Court on the Motion to Suppress and Request for Evidentiary Hearing (Filing No. 14) filed by Defendant, Darnell Polite. Defendant filed a brief in support of the motion (Filing No. 15) and the government filed a brief in opposition (Filing No. 17).

   The Court held an evidentiary hearing on the motion on August 29, 2017. Defendant was present with his attorney, Richard McWilliams. The government was represented by Assistant United States Attorney, Matt Lierman. City of Omaha police officers Mike Sundermeier ("Officer Sundermeier") and Officer David Preston, Jr. ("Officer Preston") testified on behalf of the government. The Court received into evidence Exhibits 1 through 17 offered by the government, and Exhibits 101 and 105 through 116 offered by Defendant. A transcript (TR.) of the hearing was prepared and filed on September 11, 2017. (Filing No. 48). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

**BACKGROUND**

   On October 31, 2016, Officer Sundermeier and Officer Preston, both assigned to the Gang Unit of the Omaha Police Department ("OPD"), were on duty and patrolling a residential area of 48th and Boyd and Sahler Streets in Northeast Omaha, which had seen an increased presence of Crips gang members. (TR. 5, 50-51). Officer Sundermeier was familiar with the area from prior narcotics and firearm investigations and had recovered firearms from the area on at least two prior occasions. Officer Preston knew of homicides that have occurred there. Both officers knew the area was associated with the Crips gang, including the 40th Ave., Hilltop, and 44th Ave. Crips. (TR. 7, 51). The officers were dressed in jeans and tactical vests marked with

"Police" on both sides. (TR. 9). They were also equipped with handcuffs, firearm, baton, mace, and a shoulder mounted audio/visual recording system. (TR. 10, 71).

At approximately 10:35 p.m. on October 31, 2016, Office Sundermeier and Officer Preston were driving eastbound on Sahler Street in Preston's unmarked Dodge Magnum to an apartment complex located at 4842 Sahler Street. (TR. 7-8, 50-51). The manager and property owner of the apartment complex had previously contacted police about the increased activity of people hanging around out front of the apartment complex, and asked police to encourage individuals not to hang out there. (TR. 10-11, 51). The apartment management provided police with keys to access the apartment's locked front doors to aid their patrol. (TR. 11).

When Officer Sundermeier and Officer Preston arrived at the apartment complex, they observed approximately twenty people standing in a parking lot out front. (TR. 13, 52). The officers recognized some individuals as 40th Ave. and 44th Ave. gang members from the officers' prior contacts. (TR. 12, 53). Officer Sundermeier stopped and activated the Dodge's red and blue lights, at which point the officers observed parties disperse east away from the officers, and west towards the apartment complex door. (TR. 13-14, 53-54).

When Officer Sundermeier exited his vehicle, he observed one individual, identified as Defendant, quickly bend down for approximately one second behind a blue Chevrolet Impala as soon as Officer Sundermeier began approaching him. (TR. 14-15, 18). Officer Sundermeier did not initially see anything in Defendant's hands. (TR. 48). No one else was in the area immediately around Defendant. (TR. 19). As Defendant ducked down behind the Impala, Officer Sundermeier heard an object hit the ground where Defendant was standing. Officer Sundermeier attributed this first sound to Defendant. Almost immediately after hearing the first sound, Officer Sundermeier then heard another object hit the ground a little bit to Defendant's east. Officer Sundermeier attributed the second sound to a group of four other individuals, including a known Crips member. (TR. 14, 17-18, 40). Officer Sundermeier described the first sound as a "metallic thump . . . metal-on-metal," and the second sound as metal or something heavy hitting the ground. (TR. 16-17). Officer Sundermeier has heard similar sounds on previous occasions when he has recovered firearms. (TR. 17). Officer Sundermeier was between twenty to thirty feet away from Defendant when he heard the sounds. (TR. 45). Officer Preston did not hear the sounds because he was speaking to a large group of people farther away. (TR. 55).

2

Officer Sundermeier knew Defendant from prior contacts. On a previous occasion, Officer Sundermeier was informed by Defendant that he is a 40th Ave. Crips gang member. Additionally, in June 2016, during the execution of a search warrant, Officer Sundermeier recovered two firearms and drugs from a residence where Defendant was living. (TR. 27-28, 32-33). Importantly, Officer Sundermeier also knew from his prior contacts that Defendant was under the age of 21. (TR. 29).

Officer Sundermeier walked to make contact with Defendant, believing Defendant had just discarded a firearm. (TR. 18). Officer Sundermeier immediately placed Defendant, who was holding a cell phone, in handcuffs and asked if he had discarded a firearm. (TR. 18-19, 48). After placing Defendant in handcuffs, Officer Sundermeier moved to the front of the Impala to look in the area where Defendant had ducked down. (TR. 20). In that location, Officer Sundermeier saw a Makarov semi-automatic pistol in the grass between the sidewalk and the building. (TR. 20, 41). The firearm was not covered in dust and did not appear to have been there for a long time. (TR. 20-21). Officer Sundermeier remained standing next to the firearm until its location could be documented and photographed. (TR. 23). Once the Crime Lab arrived on the scene, Officer Sundermeier obtained the serial number of the firearm recovered near Defendant and found it was not registered. (TR. 29).

A second firearm wrapped in a blue bandana was found in the location where Officer Sundermeier had heard the second sound and observed the four other individuals, including the known Crips member. (TR. 23). The Court received into evidence photographs of the recovered firearms and area around them (Exhibits 5-10), as well as the body camera footage from Officer Sundermeier's body camera (Exhibit 17) and Officer Preston's body camera (Exhibit 16).

The officers transported Defendant to Central Headquarters to be interviewed. (TR. 29, 60). Defendant was placed in an interview room equipped with an audio/visual recording system, which was activated when Defendant was first placed in the room. (TR. 62-63). The audio/visual recording of the interview room was received into evidence (Exhibit 15). (TR. 63). Defendant's handcuffs were taken off once he was in the interview room. (TR. 84).

Officer Preston conducted the interview with Defendant. Prior to the interview, Officer Preston utilized an OPD Rights Advisory Form (Exhibit 4), which he read to Defendant word for word. (TR. 64-65). Officer Preston believed Defendant was under the influence of marijuana, but he appeared to be in tune, lucid and understood what was taking place. Defendant also

3

responded appropriately to questions. (TR. 65). Officer Preston made no threats or promises, and Defendant did not appear to be under duress or have any medical issues. (TR. 66).

Officer Preston questioned Defendant for less than an hour. (TR. 66). During the interview, Defendant consented to provide a DNA sample and provided his address which was placed on a consent form (Exhibit 3). (TR. 66-67). Officer Preston testified that both he and Defendant signed the consent form. A buccal swab was taken from Defendant as a result of this consent. (TR. 68).

During the interview Defendant also consented to a search of his cell phone by signing a Permission to Search Digital Media Device consent form (Exhibit 2). (TR. 68-69). Defendant provided his password/PIN code to unlock his phone. (TR. 69). As a result of this consent, an extraction of the cell phone data was completed (Exhibit 14). Officer Sundermeier also took photographs of the pictures contained on Defendant's cell phone (Exhibits 11-13). (TR. 30-31).

Both Officer Sundermeier and Officer Preston testified that they did not draw their firearm during any point of their contact with Defendant. (TR. 19, 71). At no point during the officers' contact with Defendant did Sundermeier or anyone else make threats, promises, or inducements to Defendant. (TR. 32, 66).

On February 22, 2017, Defendant was charged in a one count Indictment with possession of a firearm while being an unlawful user of, or addicted to, a controlled substance, in violation of 18 U.S.C. § 922(g)(3). (Filing No. 1). Defendant filed the instant Motion to Suppress, arguing he was unlawfully detained by Officer Sundermeier without reasonable suspicion and arrested without probable cause, and as a result, any statements he made and any evidence obtained from a buccal swab and the search of his cell phone are inadmissible as fruit of the poisonous tree. (Filing No. 14).

## ANALYSIS

**I. Initial Detention**

Defendant first argues that his initial contact with Officer Sundermeier was an unlawful seizure unsupported by reasonable suspicion. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Reasonable suspicion is determined by 'look[ing] at the

4

totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing [based upon his] own experience and specialized training to make inferences from and deductions about the cumulative information available.'" *United States v. Jones*, 606 F.3d 964, 965-66 (8th Cir. 2010)(quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)(citations and quotations omitted)). When considering whether an officer's suspicion was reasonable, the court "'must determine whether the facts collectively provide a basis for reasonable suspicion, rather than determine whether each fact separately establishes such a basis.'" *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011)(quoting *United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008)). "[F]actors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *Id.* (citing *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006).

In this case, the totality of the circumstances supported Officer Sundermeier's reasonable suspicion that Defendant was engaged in criminal activity. The record establishes that Officers Sundermeier and Preston were on patrol at night in an area they both knew to be a Crips street gang gathering area where homicides have occurred and firearms have been recovered. See *Wardlow*, 528 U.S. at 124 ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis."). As soon as the officers activated their unmarked vehicle's overhead lights, a crowd of twenty individuals, some of whom the officers knew from prior contacts were gang members, began to disperse. See *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995)("Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence."). One of these individuals included Defendant, who Officer Sundermeier knew from prior contacts was affiliated with the 40th Ave. Crips and was under the age of twenty-one. See *United States v. Cornelius*, 391 F.3d 965, 967 (considering officers' knowledge of defendant's gang affiliation). As soon as Officer Sundermeier exited his vehicle, he observed Defendant quickly bend down and stand back up again behind a vehicle. Officer Sundermeier heard a metallic sound of an object hitting the ground as Defendant bent behind the vehicle. In Officer Sundermeier's training and experience, he believed the sound was that of a firearm. Officer Sundermeier also knew that a few months earlier, firearms and drugs had been recovered from Defendant's residence. Although Defendant

5

disputes Officer Sundermeier's account of events, after hearing Officer Sundermeier's testimony and observing him in court, the undersigned magistrate judge finds his testimony to be credible.

Defendant likens the instant case to *United States v. Jones*, 606 F.3d 964 (8th Cir. 2010), wherein the Eighth Circuit Court of Appeals disapproved of a stop and frisk based on an officer's observation of an individual clutching the front area of his hoodie as he walked through a church parking lot in the afternoon. The Eighth Circuit in *Jones* concluded the officer "lacked the requisite reasonable suspicion that [the defendant] was carrying a concealed firearm" because "too many people fit this description for it to justify a reasonable suspicion of criminal activity." *Jones*, 606 F.3d at 966-67. However, Defendant in this case ignores the additional factors that were not present in *Jones*. When Officer Sundermeier stopped Defendant, Officer knew Defendant's age and gang affiliation, the recovery of firearms at Defendant's residence four months before, and knew the large crowd of individuals nearby contained known gang members. Additionally, Officer Sundermeier observed Defendant's quick movement behind the Impala combined with a metallic noise, which Officer Sundermeier associated with a firearm hitting the ground, based on prior training and experience. When taken together with all of the facts and circumstances known to Officer Sundermeier, the undersigned magistrate judge concludes there was reasonable suspicion to initially detain Defendant to investigate. See *United States v. Roelandt*, 827 F.3d 746, 748-49 (8th Cir. 2016)(finding reasonable suspicion where officer knew defendant was a felon and gang member, the officer knew of past reports that defendant had a gun, and officers observed defendant "walking quickly through a high-crime area and suspiciously looking around.").

Additionally, the manner in which Officer Sundermeier conducted the initial stop was lawful. A *Terry* stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001). "During a *Terry* stop, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the stop." *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (citing *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005)). Use of handcuffs can be a reasonable precaution during a *Terry* stop to protect an officer's safety and maintain the status quo. *Id.* (citations omitted); see *United States v. Miller*, 974 F.2d 953, 957 (8th Cir.1992) (concluding that handcuffing suspects during a stop where

suspects outnumbered officers and where officers were concerned for safety was reasonably necessary to achieve purposes of the stop).

In this case, Officer Sundermeier was authorized to place Defendant in handcuffs at the outset of the stop, given the officer's knowledge of Defendant's gang affiliation and association with firearms and Defendant's proximity to the large crowd of known gang members. Shortly after placing Defendant in handcuffs, Officer Sundermeier moved to investigate the area where he believed Defendant had discarded a firearm, and immediately saw a firearm in the grass in the area where Defendant had ducked behind the vehicle moments before.

In consideration of the above, the undersigned magistrate judge concludes Officer Sundermeier had reasonable suspicion to initially stop Defendant and the stop was objectively reasonable under the circumstances.

## II. Lawfulness of Arrest

Defendant next argues he was unlawfully arrested without a warrant or probable cause. "A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "'To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Id.* (citing *United States v. Webster*, 625 F.3d 439, 442 (8th Cir. 2010). "Instead, the mere 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity,' is all that is required." *Id.* quoting (*United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005)). "Law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation marks and citation omitted).

In this case, Officer Sundermeier had probable cause to arrest Defendant for illegally possessing a firearm. The record establishes that Officer Sundermeier knew that Defendant was

7

under the age of twenty-one years and knew that twenty-one is the age for legal ownership of a handgun in the City of Omaha.[1] Officer Sundermeier immediately spotted a firearm in the same area where Defendant had ducked behind the Impala and from where Officer Sundermeier had heard a metallic thump on the ground. Officer Sundermeier testified that the firearm did not appear to have been there for a long time, which is corroborated by the photographs of the firearm received into evidence. Under the circumstances, Officer Sundermeier had probable cause to arrest Defendant for illegally possessing a firearm.

Because Defendant's initial detention was supported by reasonable suspicion, and subsequent arrest was supported by probable cause, the evidence and statements subsequently obtained were not fruit of the poisonous tree. Defendant was not unlawfully detained or arrested, and therefore this evidence did not flow from unlawful police conduct. Upon consideration,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge John M. Gerrard that Defendant's Motion to Suppress and Request for Evidentiary Hearing (Filing No. 14) be denied.

Dated this 20th day of September, 2017.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

---

[1] Although the government cites to the Omaha Municipal Code § 20-215, the record does not contain the municipal code. However, Nebraska state law provides that carrying a concealed weapon, including a handgun, is a crime, unless the individual is a valid permit holder under the Concealed Handgun Permit Act. Neb. Rev. Stat. § 28-1202. Applicants for a permit under the Concealed Handgun Permit Act must be at least twenty-one years old, which Officer Sundermeier knew Defendant was not. See Neb. Rev. Stat. § 69-2433.

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.